THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD LOWITZKI, Defendant-Appellant.

First District (1st Division) No. 1—93—2616

Opinion filed December 9, 1996.

Genson, Steinback, Gillespie & Martin, of Chicago (Edward M. Genson and Marc W. Martin, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William John Healy, and James Navarre, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a stipulated bench trial, defendant, Edward Lowitzki, was convicted of theft and sentenced to four years' imprisonment in the Illinois Department of Corrections. On appeal, defendant argues: (1) the trial court erred in granting the State's motion *in limine*, seeking to preclude the defendant from presenting an insanity defense based upon pathological gambling; (2) the trial court erred in granting the State's motion *in limine*, seeking to bar defendant from calling witnesses in support of his insanity defense on grounds that they were post-occurrence lay witnesses; and (3) the trial court's ruling barring defendant from calling witnesses at trial or raising an insanity defense violated his state and federal constitutional rights.

Defendant was charged with the theft of $101,004.14 from the Palatine High School's Very Important Person's Club. Defendant's son was a member of the club, and defendant served as treasurer. The club had been raising money for students to attend a music festival in Hawaii.

During the discovery stage of trial, defense counsel informed the State that it intended to raise the affirmative defense of insanity based upon pathological gambling. The State responded by filing a motion *in limine*, which sought to prevent defendant from raising this insanity defense. The State asserted that, as a matter of law, pathological gambling could not be raised as an insanity defense against a nongambling offense, such as theft. The State also asserted that defendant was improperly attempting to use post-occurrence lay witnesses to give expert testimony on his state of mind at the time of the occurrence. A hearing followed where the following testimony was elicited.

Dr. Henry Lesieur, a professor of criminal justice and the chairperson of the Department of Criminal Justice Sciences at Illinois State University, testified for the defense. Dr. Lesieur holds a Ph.D. in sociology and has written several articles on pathological gambling. He was one of six or seven committee members who drafted the criteria for pathological gambling on the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, Third Edition Revised (DSM-III-R). Dr. Lesieur is also a member of the board of directors and the executive board of the National Council on Problem Gambling. He is a member of the American Psychiatric Association and works in a group on disorders of impulse control. Dr. Lesieur testified that pathological gambling has been recognized as a disease by the American Psychiatric Institute, the American Psychiatric Association, and the World Health Organization.

Dr. Lesieur stated that he is not a psychiatrist, medical doctor, psychologist, or social worker. His expertise involves the diagnosis of pathological gambling, but he does not treat pathological gamblers. Dr. Lesieur testified that his belief is that once a person has reached the desperation phase of his or her illness, that person is unable to conform his or her conduct to the law.

On August 28, 1992, more than a full year after the alleged theft occurred, Dr. Lesieur interviewed defendant for three hours and administered a questionnaire developed by the American Psychiatric Association. Dr. Lesieur then made an assessment of defendant regarding the nature of his thinking at the time of the alleged theft. Dr. Lesieur found that defendant was a pathological gambler and was under the delusion that he was a professional gambler. In Dr. Lesieur's opinion, defendant was unable to conform his conduct to the law. Dr. Lesieur did admit, however, that there are people who reach desperate financial conditions due to pathological gambling and seek help without breaking the law.

Dr. Lesieur further testified that psychiatrists have referred patients to him in order to determine whether the patients fit the criteria for pathological gambling. Yet, he has never been asked by a psychiatrist to diagnose a patient as having the disorder of pathological gambling. He also stated that in most situations where there is a question of whether a patient is suffering from a forensic psychiatric condition, such as insanity, he would refer the patient to a forensic psychiatrist rather than diagnose that patient himself.

Christopher Anderson, a clinical psychotherapist, also testified for the defense. He has a master's of science in clinical counseling and is himself a recovering pathological gambler. At the time of trial, he had been diagnosing individuals who were thought to be pathological gamblers for five years.

Anderson testified that he first met defendant at a Gamblers Anonymous meeting in February 1991. He later examined defendant by asking him 20 questions used in Gamblers Anonymous, of which defendant answered 19 affirmatively. Defendant's answers led Anderson to conclude that he was a pathological gambler. Anderson opined that defendant could not conform himself to the rules and regulations of society from May 1990 to May 1992, encompassing the time of the alleged theft.

Anderson further testified that in conducting his examination of defendant, he looked over the reports of Dr. Valerie Lorenz and Arnie Wexler. Anderson stated that he agreed with their findings that defendant was a pathological gambler and that a person in the desperation stage of pathological gambling is insane. He also stated that he knew by inference that Dr. Lorenz and Wexler would state that defendant was insane while in the desperation stage, even though their reports did not specifically state so.

Dr. Albert Stipes, an employee for 13 years of the Psychiatric Institute of the Circuit Court of Cook County, testified for the State. Dr. Stipes is licensed as a physician and a surgeon and is certified by the American Board of Psychiatry and Neurology.

Dr. Stipes stated that not all of the classifications in the DSM-III-R are bases for a mental disease or defect under the Illinois criminal statute. He stated that pathological gambling is in the DSM-III-R under the impulse control disorders along with kleptomania and pyromania. There is a cautionary statement in the DSM-III-R regarding the inclusion of categories such as pathological gambling. It warns that the inclusion does not imply that the condition meets legal or other nonlegal criteria for behavior constituting a mental disease or disorder. Dr. Stipes testified that pathological gambling is not a disease that would rise to the level of insanity under Illinois law.

Dr. Stipes further testified that, in Illinois, a psychiatrist, a licensed medical doctor, a licensed psychologist, or a psychiatric social worker can render a diagnosis of mental illness, but an individual with a doctorate in sociology cannot make such a diagnosis. He further stated that the psychiatric community does not generally agree that pathological gambling may deprive people of the substantial capacity to conform their conduct to the requirements of the law. Additionally, he stated that it is not generally accepted in the psychiatric community that pathological gambling can serve as the basis for an insanity defense in Illinois, especially when an individual is charged with a nongambling offense such as theft.

On cross-examination, Dr. Stipes stated that he learned of patho-

logical gambling in a course taught by an expert in impulse control disorders during his residency. He stated that he did not have any specialized training in pathological gambling, and he has only treated two people for pathological gambling. Dr. Stipes stated that he testified on pathological gambling in federal court in 1983, but has never been deemed specifically qualified as an expert in the field of pathological gambling.

After hearing arguments on the motion, the trial court granted the State's motion *in limine*.

The parties then agreed to a stipulated bench trial. At trial, it was stipulated that defendant had exercised unauthorized control over $101,004.14 belonging to the Palatine High School VIP Booster Club (Booster Club). It was further stipulated that if Tanya Bergman, who served as co-president of the Booster Club in 1990, were called to testify, she would state that defendant was elected treasurer of the club on June 4, 1990. As treasurer, defendant was responsible for maintaining the club's financial records, making financial reports to the board of directors, collecting funds, and making disbursements for various legitimate club expenses. Although two signatures were required on the Booster Club checks, Tanya Bergman and her husband, Jack Bergman, presigned checks and gave them to defendant in order to facilitate disbursements.

The parties also stipulated that on February 1, 1991, Tanya Bergman received a letter from defendant. In the letter, defendant expressed his remorse and asked the Bergmans to help him "straighten this out." The letter stated that defendant was "in the process of obtaining a large loan to pay back everything." Defendant asked the Bergmans not to tell anyone about the theft and he promised to replace the stolen money within 30 to 40 days. He also promised to contact the Bergmans over the weekend, but he did not contact them again until March 20, 1992, by a second letter, in which he admitted that his theft was wrong.

It was further stipulated that Tanya Bergman would testify that defendant was not authorized to write checks to either himself or his company.

The State also introduced the stipulated testimony of Raelene Horn, the band director of Palatine High School. The parties stipulated that Horn would testify that the band and choir had been invited to a festival concert in Hawaii in 1991. Each student needed to pay $1,188 to attend. Throughout the year the students participated in various fundraisers to help offset the cost. The money raised was apportioned to each of the students who volunteered their time and labor to the fundraisers. Horn collected the money from the students and turned it over to defendant.

Sometime between November 22, 1991, and December 9, 1991, Horn received a letter written by defendant. The letter asked Horn to forgive him and stated that as long as he did not gamble he was "the same kind of person" that Horn was.

Defense counsel then made an offer of proof in which the defense adopted the testimony of Dr. Lesieur and Christopher Anderson given at the motion *in limine* hearing. The defense also proffered that Dr. Armin Daghestani, a psychiatrist at Loyola Medical Center, would testify that she examined defendant in November 1992 and concluded that defendant was suffering from pathological gambling and depression. Dr. Lorenz, who was in charge of the National Center for Pathological Gambling, also examined defendant and determined that defendant was a compulsive gambler. Finally, Arnie Wexler, the director of the Council of Compulsive Gambling in New Jersey, examined defendant and concluded that defendant was a compulsive gambler.

After hearing closing arguments, the trial court found defendant guilty of the theft of over $100,000 from the Palatine High School VIP Club. The court then proceeded to hold a sentencing hearing. The State offered nine witnesses in aggravation, and defendant called several recovering compulsive gamblers in mitigation. The court sentenced defendant to four years' imprisonment in the Illinois Department of Corrections. Defendant now appeals from that order. For the reasons set forth below, we affirm.

This is a case of first impression in Illinois since neither this court nor the Illinois Supreme Court has yet addressed the first issue presented by defendant on appeal. Following a careful review, we find that the State's motion *in limine* was properly granted since pathological gambling may not be the basis of an insanity defense against a nongambling offense.

■ Whether a motion *in limine* to exclude evidence should be granted is within the discretion of the trial court. *People v. Goka*, 119 Ill. App. 3d 1024, 1029-30, 458 N.E.2d 26, 31 (1983). In Illinois, "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6—2(a) (West 1992). Thus, to raise an insanity defense under Illinois law, the defendant must show that he suffered from a mental disease or defect and, as a result, he was unable to either comprehend the criminality of his conduct or conform his conduct to the law. *People v. Vanda*, 111 Ill. App. 3d 551, 568, 444 N.E.2d 609, 622 (1982).

■ The classification of a mental disease or defect developed by

psychiatrists for the purpose of treatment does not control the legal definition used for assessing criminal responsibility. *People v. Uppole*, 97 Ill. App. 3d 72, 79, 422 N.E.2d 245, 249 (1981). Furthermore, the admissibility of new scientific techniques must be evaluated under the *Frye* "general acceptance" standard. *People v. Eyler*, 133 Ill. 2d 173, 211, 549 N.E.2d 268, 287 (1989). Although this standard has been superseded in federal court by the perhaps more liberal Federal Rules of Evidence, as set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 588, 125 L. Ed. 2d 469, 480, 113 S. Ct. 2786, 2794 (1993), the *Frye* standard remains the appropriate standard in Illinois. *People v. Watson*, 257 Ill. App. 3d 915, 924, 629 N.E.2d 634, 640-41 (1994). This standard provides that "while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).

■ Considering defendant's proffered insanity defense in light of the *Frye* standard, it becomes clear that pathological gambling cannot serve as the basis for an insanity defense against a theft charge. We do not dispute that the mental health community believes that pathological gambling is a mental disease or disorder which must be treated. It, however, does not automatically follow that pathological gambling is a disease for purposes of the insanity defense in Illinois. Indeed, the DSM-III-R explicitly cautions that its inclusion of pathological gambling for clinical and research purposes does not imply that the condition meets the legal criteria for a mental disease or disorder.

■ Defense witnesses Dr. Henry Lesieur and Christopher Anderson opined that defendant lacked the capacity to conform his conduct to the requirements of law because he suffered from pathological gambling. However, defendant's failure to show that this principle is generally accepted among the psychiatric community is fatal to defendant's position. In fact, Dr. Stipes testified that there is *not* general agreement within the psychiatric community that pathological gambling deprives people of the substantial capacity to conform their conduct to the requirements of the law.

■ Significantly, defendant also failed to show a causal connection between defendant's pathological gambling disease and the non-gambling crime of theft. The fact that theft may be a common crime among pathological gamblers does not support the notion that pathological gambling can be raised as an insanity defense against a theft

charge. Again, Dr. Stipes testified that it is not generally accepted that pathological gambling can serve as the basis for an insanity defense when an individual is charged with theft.

Other courts as well have found that defendants have failed to prove the requisite connection between pathological gambling and nongambling crimes. In *United States v. Davis*, 772 F.2d 1339 (7th Cir. 1985), for example, the court found that expert testimony concerning compulsive gambling and the DSM-III-R failed to establish the necessary support within the mental health community for the proposition that compulsive gambling involves the inability to conform one's conduct to the laws prohibiting check forgery and conversion. *Davis*, 772 F.2d at 1347. The court, therefore, affirmed the trial court's ruling, which excluded the testimony of defendant's proffered experts on pathological gambling.

The *Davis* court stated:

> "[I]t does not seem to us enough to show that gambling is compulsive (the result of an irresistible impulse), money is necessary for gambling and therefore the stealing of money is equally 'compulsive.' The stealing may follow as a matter of logic or means-end reasoning but this in itself should not necessarily result in a psychiatric characterization of the act of stealing as 'compulsive.'" *Davis*, 772 F.2d at 1347.

See also *United States v. Gillis*, 773 F.2d 549 (4th Cir. 1985) (finding the connection between pathological gambling and the offenses of fraud, misrepresentation, and forgery was not shown to be substantially accepted in the mental health community, and holding that evidence of defendant's pathological gambling was irrelevant); *United States v. Torniero*, 735 F.2d 725 (2d Cir. 1984) (holding same as to transporting stolen property); *United States v. Lewellyn*, 723 F.2d 615 (8th Cir. 1983) (holding same as to embezzlement and similar offenses); *United States v. Shorter*, 809 F.2d 54 (D.C. Cir. 1987) (holding same as to failure to pay taxes).

The seventh circuit has since extended *Davis* and expressly held that compulsive gambling cannot be the basis of an insanity defense to a nongambling offense. *United States v. Carmel*, 801 F.2d 997, 999 (7th Cir. 1986). The court left open the question of whether compulsive gambling could be the basis of a defense to a gambling offense, and we refuse to make such a broad ruling here. But it is clear to us that in cases involving theft, such as this one, an insanity defense based upon pathological gambling will not stand.

In addition to the fact that defendant's insanity defense was not based upon generally accepted scientific principles, we find that defendant's witnesses, Dr. Lesieur and Christopher Anderson, were

not scientifically competent to testify. We agree that defendant was improperly seeking to use post-occurrence lay witnesses to give expert testimony of defendant's state of mind at the time of the occurrence.

■ In Illinois, a psychiatrist or a licensed clinical psychologist is qualified to testify as an expert witness regarding insanity or mental illness. 730 ILCS 5/5—2—5 (West 1992). In order to be a licensed clinical psychologist, an individual must have a doctorate in psychology. 725 ILCS 5/102—21 (West 1992); 225 ILCS 15/10 (West 1992). The determination of whether to admit expert testimony is committed to the discretion of the trial court. *People v. Eyler*, 133 Ill. 2d 173, 211, 549 N.E.2d 268, 285 (1989). The burden of establishing the qualifications of an expert witness rests with the proponent of the expert's testimony. *People v. Free*, 94 Ill. 2d 378, 410, 447 N.E.2d 218, 233 (1983). Although lay opinions regarding a defendant's sanity based on observations made shortly before and after a crime are admissible, observations that are too remote in time from the crime are an insufficient basis for lay opinion. *People v. McDarrah*, 175 Ill. App. 3d 284, 293, 529 N.E.2d 808, 813 (1988).

■ It is clear that neither Dr. Lesieur nor Christopher Anderson was qualified to testify as an expert regarding defendant's sanity under Illinois law. Furthermore, neither witness can testify as a lay witness regarding defendant's mental state at the time he committed the offenses since neither observed defendant shortly before or after the occurrence. Dr. Lesieur first examined defendant in August of 1992, more than a year after the incident. Although the record is unclear as to when Christopher Anderson first examined defendant, defendant does not dispute that Anderson could not testify as a post-occurrence lay witness. Thus, the trial court did not abuse its discretion in barring their testimony as to defendant's sanity.

■ Finally, we are unpersuaded by defendant's argument that the trial court's ruling barring him from raising an insanity defense or calling expert witnesses in support thereof violated his state and federal constitutional rights. Defendant undeniably has the right to present a defense, but this right does not include the right to introduce irrelevant evidence. *People v. Varellas*, 138 Ill. App. 3d 820, 828, 486 N.E.2d 388, 394 (1985).

The motion *in limine* precluded defendant from presenting expert testimony to establish an insanity defense based upon pathological gambling because the mental health community did not sufficiently accept the nexus between the disorder and acts of theft. Dr. Lesieur and Christopher Anderson were prevented from testifying simply because they did not qualify as experts. While Dr. Armin Daghestani, a psychiatrist, was qualified to testify as an expert regarding insanity

defenses in general, she was precluded from testifying as an expert to establish defendant's particular insanity defense because her proposed testimony became irrelevant after the motion *in limine* had been granted. Since the trial court's ruling prevented defendant only from presenting an insanity defense unaccepted by the medical community in Illinois and calling witnesses in support thereof, defendant's constitutional rights were not violated.

For the foregoing reasons, we find that the circuit court did not abuse its discretion in granting the State's motion *in limine* and affirm defendant's conviction.

Affirmed.

WOLFSON and BRADEN[1], JJ., concur.

---

[1]Justice Braden concurred in the disposition of this appeal before his departure from the court.